UNITED STATES BANKRUPTCY COURT
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:  DAVID CUTLER INDUSTRIES, LTD.** | : | **Chapter 11** |
| | : | |
| **Debtor** | : | **Bky. No.  09-18716 ELF** |
| | : | |
| | : | |
| **DAVID CUTLER INDUSTRIES, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **Adv. No. 09-00373** |
| **DIRECT GROUP, INC., et al.** | : | |
| | : | |
| **Defendants** | : | |

# M E M O R A N D U M   O P I N I O N

## I. INTRODUCTION

On November 16, 2009, David Cutler Industries, Ltd. ("DCI") filed a chapter 11

bankruptcy petition in this court.  In the three (3) months that followed, DCI filed six (6)

adversary proceedings against various defendants, seeking to recover money or property based on

various causes of action, including claims under 11 U.S.C. §547 (preferential transfers), 11

U.S.C. §548 (fraudulent transfers) and 11 U.S.C. §542 (request for turnover).  DCI also is a

defendant in a seventh adversary proceeding that is in the nature of an interpleader.

Walter Weir, Jr. ("Weir") and his law firm, Weir & Partners, LLP ("Weir & Partners"),[1]

---

[1]      Throughout this Memorandum, I will refer to Weir and Weir & Partners interchangeably, except when referring to specific actions that Weir took personally.

presently represent several defendants, including DCI's former president, in four (4) of the adversary proceedings. Weir also entered his appearance generally on behalf of DCI's former president in the "main" bankruptcy case.

Presently before the court is DCI's motion to disqualify Weir and Weir & Partners from representing any parties with interests adverse to DCI in the main bankruptcy case and any related adversary proceedings ("the Motion to Disqualify").

DCI asserts that Weir previously represented DCI, that the interests of Weir's current clients are directly adverse to DCI's interests and that the subject matter of the adversary proceedings in which he is representing adverse parties is substantially related to the subject matter of Weir's prior representation of DCI. DCI's primary argument is that Weir's conduct violates Rule 1.9(a) of the Pennsylvania Rules of Professional Conduct ("Pa. RPC") and that the court should disqualify him on that basis.

In opposition, Weir asserts that he never had an attorney-client relationship with DCI and therefore, DCI could not be a "former client" within the meaning of Pa. RPC 1.9(a). Alternatively, Weir argues that even if DCI was his "former client," the subject matter of Weir's current representations is not "substantially related" to any representation he previously provided to DCI and that there is no likelihood that any confidential information he obtained during such representation would be prejudicial to DCI in the bankruptcy court proceedings.

For the reasons set forth below, the Motion to Disqualify will be denied.

2

## II.  PROCEDURAL HISTORY

On November 16, 2009, DCI filed its voluntary petition for relief under Chapter 11 of the

Bankruptcy Code.  Since the petition date, DCI has acted as a debtor-in-possession pursuant to

11 U.S.C. §§ 1107 and 1108 and filed a number of adversary proceedings.  Four (4) of them are

relevant to the Motion before the court.  Those adversary proceedings are:

1. David Cutler Indus., Ltd. v. Direct Group, Inc., et al., Adv. No. 09-0373 (Weir & Partners' appearance entered on behalf of the Debtor's former president, Darryl Cutler, as well as Independence Pulp & Paper Co., LLC, Jeffrey Pitkow and Jason Garon) ("the State Road Turnover Action");

2. Smurfit-Stone Container Enter. v. David Cutler Indus., Ltd., et al., Adv. No. 10-0028 ((Weir & Partners' appearance entered on behalf of Northstar Pulp & Paper Co., Inc.) ("the Smurfit-Stone Container Payable Interpleader");

3. David Cutler Indus., Ltd. v. Converting Solutions, LP, et al., Adv. No. 10-0042 ((Weir & Partners' appearance entered on behalf of Darryl Cutler) ("the Converting Solutions Adversary");

4. David Cutler Indus., Ltd. v. Sovereign Bank, et al.), Adv. No. 10-0054 ((Weir & Partners' appearance entered on behalf of Darryl Cutler) ("the Sovereign Bank Adversary").

In addition to his firm's entries of appearance in the above proceedings, on December 11,

2009, Weir entered his appearance generally on behalf of Cutler in the main bankruptcy case.[2]

On January 6, 2010, the Debtor filed the Motion to Disqualify, to which Weir responded

on January 26, 2010.  The Motion was filed in the main bankruptcy case and in Adv. No. 09-373,

but not in the latter three (3) other adversary proceedings identified above.  Those adversary

---

[2]    Aside from his role as a target in DCI's adversary proceedings, Cutler is a party in interest and perhaps a creditor in this case.  DCI listed Cutler in Schedule H as a co-debtor on its obligations to Bryn Mawr Trust and Sovereign Bank.  (Bky. No. 09-18716, Doc. #75).

3

proceedings were commenced after DCI filed the Motion to Disqualify.[3]

The hearing on the Motion was held and concluded on February 17, 2010.  At the hearing

three (3) witnesses testified: Michael Flitter ("Flitter"), Jonathan Gayl and Walter Weir.

Following the hearing, both sides submitted memoranda in support of their respective

positions.  The notes of testimony ("N.T.") were made available to the court on March 4, 2010.

(Doc. #135).  This Memorandum constitutes my findings of fact and conclusions of law.[4]


### III.  FACTUAL BACKGROUND

Prior to filing its bankruptcy case, DCI was in the business of converting paper.  Its

business consisted of two (2) primary parts: (1) purchasing waste paper from various suppliers,

and processing and delivering the waste paper to various purchasers and (2) buying and selling

paper rolls and other converted paper.  (N.T. at 29).  DCI ceased its business operations on

September 25, 2009.

David Cutler, the founder of DCI, died in 2004.  As of February 2009, his son, Darryl

---

[3]    While the Motion to Disqualify does not reference the three (3) later-filed adversary proceedings, in the Motion DCI did request that Weir & Partners be disqualified from representing Daryl Cutler, Jason Garon, Jeffrey Pitkow, and Independence Pulp and Paper Company, LLC and Northstar Pulp and Paper Co in "this bankruptcy case or in any other adversary proceeding related to this bankruptcy case." Motion at p. 14.  Those are the parties that Weir's firm is representing in the later-filed adversary proceedings.  Therefore, in this Memorandum I will discuss all four (4) adversary proceedings identified in the text above.

[4]    In addition to the evidence presented during the hearing, I have taken judicial notice of certain documents filed in the bankruptcy case for the purposes of ascertaining timing and providing chronological context.  See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998); See also In re Indian Palm Assocs., Ltd., 61 F.3d 197, 205 (3d Cir. 1995).  Also, in the recitation of the Factual Background, I have set forth certain facts, gleaned from evidence presented at other hearings in this bankruptcy case, that I understand to be undisputed – also for the purpose of placing the evidentiary matter offered at the February 17, 2010 hearing in a factual context.

Cutler ("Cutler"), was President and CEO of DCI. However, Cutler did not own any of the voting stock of DCI. By virtue of David Cutler's will, DCI's voting stock is controlled by David Cutler's estate.[5]

The executors of the estate are Jonathan Gayl and Hannah Cutler. Gayl was a financial management consultant to DCI for many years. He became the President of DCI on approximately August 12, 2009, immediately after Cutler resigned that position. (N.T. at 29). Hannah Cutler is David Cutler's daughter.[6]

In early 2009, Cutler was also involved in another business called Converting Solutions. DCI has no ownership interest in Converting Solutions. (N.T at 10).

On or about February 20, 2009, Weir sent a letter, addressed to Cutler, confirming the terms on which Weir had agreed to represent Cutler. (Ex. R-1). The letter stated that Cutler had

---

[5]     The succession scheme David Cutler put in place in his will appears to have created conflict among the DCI principals. After his father's death, Cutler was running the company, but did not own a controlling interest. The executors of his father's estate wanted Cutler to buy out their voting stock – I presume to permit a cash distribution to the beneficiaries under David Cutler's will. While the record has not been developed on the issue, I also infer that Cutler would have received little, if any, of that distribution, which may have created a disincentive for him to "buy out" the decedent's estate and an incentive for him to maximize the compensation he drew from DCI. In any event, Cutler did not "buy out" the decedent estate's interest in DCI and the executors believe that he took excessive compensation from the company, particularly after it began to experience financial difficulties. In response, Cutler's position appears to be that, the compensation he drew from DCI while it was profitable was reasonable and, in any event, after the company ran into financial difficulty, he invested substantial sums of his own money in DCI.

I make these observations only to describe generally the nature of the conflict between the parties and to provide a perspective on the events described in this Memorandum. I have not relied upon any evidence outside the record made on the Motion to Disqualify to resolve any factual disputes relating to the Motion. At this point, I have no view whatsoever on the merits of any of the disputes between the executors of David Cutler's estate and Cutler.

[6]     In a prior hearing on an unrelated matter in this bankruptcy case, Gayl testified that Hannah Cutler is David Cutler's daughter and that she worked at DCI for many years, but ceased doing so about fifteen (15) years ago.

requested Weir's services in connection with a "workout and/or restructure" of his obligations

with, among others, Firstrust Bank. Cutler's problems with Firstrust arose out of his

involvement with Converting Solutions. (N.T at 10). Weir testified, consistent with the

February 20th letter, that Cutler engaged him to address "personal insolvency issues that he had."

(N.T. at 53).

Weir received an initial retainer of $15,000.00 related to this engagement. The retainer

was paid on or about February 23, 2009 in the form of a check from DCI, signed by Cutler.

(See Ex. DCI-1). According to Weir, the fact that the retainer check came from DCI, rather than

Cutler's personal account, is neither odd nor does it suggest that DCI was included within the

scope of the representation. Weir understood that DCI owed Cutler substantial sums of money,

(N.T. at 55) and presumably, assumed that DCI paid Cutler's personal obligation as a means of

repaying its debt to Cutler.

DCI disagrees with Weir's description of the scope and nature of the representation that

Weir undertook in February 2008. DCI maintains that DCI, and not Cutler, retained Weir.

Flitter, an accountant who worked for both DCI and Cutler personally, testified that DCI

sometimes paid the personal expenses of Cutler but when it did so, it had a bookkeeping

mechanism to account separately for such personal expenses. Flitter pointed out that DCI

booked the Weir retainer check as a DCI legal expense, not a Cutler personal expense. (N.T. 13-

14).

In April or May of 2009, Cutler sought Weir's advice regarding certain trade debt DCI

owed. One trade creditor, American Color Graphics ("ACG") asserted that DCI owed it more

than $1 million, while Cutler believed that the payable was approximately $455,000. To assist

Weir's attempt to resolve the discrepancy or otherwise compromise the debt, Flitter provided

Weir a schedule of all of DCI's outstanding payables that Weir later sent to ACG's lawyer. (N.T.

at 69), and Cutler had a series of discussions with Weir about DCI's financial condition, (N.T. at

56-58, 63, 76).   Occasionally, Flitter was present during these discussions. Weir also reviewed

several financial documents Flitter provided, presumably to aid such discussions.

There is some dispute as to what financial documents Weir reviewed.  Flitter testified that

no one in authority placed any restrictions on the information that he could provide to Weir, but

could not specifically remember what information he actually supplied. (N.T. at 15). Weir

testified that he only reviewed a worksheet pertaining to a breakdown of the debt owed to ACG

to resolve the discrepancy between DCI and ACG about the amount of such debt.  However,

there is one time entry in Weir's records dated May 28, 2009 that states: "REVIEW BALANCE

SHEET AND P&L FOR DAVID CUTLER INDUSTRIES, PHONE CALL." (Ex. DCI-2).

Other Weir time entries refer to "cash flow projections" and "financial statements,"[7] without

identifying the entity involved, making it possible that these time entries refer to documents

relating to Converting Solutions, not DCI.[8]  At the hearing, DCI did not press Weir to clarify the

meaning of these time entries.

In any event, as a result of his discussions with Cutler and Flitter and his review of some

documents, Weir learned, inter alia that:

---

[7]        (See Ex. DCI-2, time entries dated May 18 and 27, 2010).

[8]        A number of other time entries refer to Converting Solutions. (See Ex. DCI-2, time
entries dated March 6, 2009, April 11 and 16, 2009, May 14, 2009).  Undoubtedly, Weir was
familiarizing himself, at least to some degree, with the financial status of that company.  In fact, certain
time entries suggest that Weir was involved in discussions with Converting Solutions' landlord.  (See id.,
time entries dated April 11,14, 15 16,, 2009, May 11, 2009).

- DCI owed about $2.8 - 3.0 million to Bryn Mawr Trust Company ("Bryn Mawr Trust") that was due to be paid within approximately three (3) to four (4) weeks.

- Cutler had guaranteed the Bryn Mawr Trust debt.

- Bryn Mawr Trust had a blanket security interest on all of DCI's assets.

- There were at least two major trade debts, ACG and Brown Printing Company ("Brown Printing"), each ranging from $1.0 - 1.5 million.

- There was other trade debt.

- DCI had approximately less than $500,000 in assets, between receivables, real estate and equipment.

(N.T. at 56-58).

During this time frame, Weir began to provide certain legal services to DCI. On May 4, 2009, Weir reviewed a letter from William Corum, counsel for ACG. (See Ex. DCI-2 at 40). That same day, Weir sent an e-mail responding to Corum's letter and expressly held himself out as DCI's counsel. (See Ex. DCI-3). Weir's time records reflect that he billed for this work against his retainer. (See Ex. DCI-2 at 40). Thereafter, and until the end of July 2009, Weir engaged in several discussions by phone and e-mail with ACG's lawyers concerning ACG's claim against DCI. (Exs. DCI-2 at 40-44 and DCI-3). In his e-mails, Weir sought a payment plan, but disputed the balance claimed by ACG. The e-mails in the record, exchanged between May 4, 2009 and June 25, 2009, do not reflect that the lawyers made much progress in closing the gap in their respective clients' positions with respect to the amount of the debt or the terms of a payment plan.[9]

---

[9] Weir also engaged in discussions with Cutler and reviewed papers regarding the Brown Printing claim. (See N.T. at 17, 73; Ex. DCI-2, Time entries dated July 23, 2009). However, Weir's time records do not reflect direct negotiations with any Brown Printing representative. The record only reflects two (2) time entries pertaining to Brown Printing and Flitter testified that he was unsure whether
(continued...)

8

On July 6, 2009, Weir also called Daniel Gibbon. Weir understood Gibbon to be the

lawyer for the executors of David Cutler's decedent estate. (N.T. at 58-59). During this phone

call, Weir advised Gibbon that Weir: (a) was representing Cutler, (b) had reviewed the situation

regarding the Bryn Mawr indebtedness and (c) had been communicating with the lawyers who

represented ACG. Weir inquired whether DCI had any plan for dealing with its financial

distress. In other words, Weir asked whether Gibbon was aware of DCI's financial troubles and

if there was an action plan under consideration. (N.T. at 59). Weir also suggested that a meeting

be held among DCI's key players. (N.T. at 60).

The record is muddled regarding other key events that took place in July 2009. Gayl,

Flitter and Weir all testified about certain meetings during this time frame, but it is not possible

to set out a clear narrative of events from the, at times, vague and somewhat contradictory

chronology in their testimony.

It appears that there were at least two meetings, one on July 1st (prior to Weir calling

Gibbon) and another on July 20th (collectively referred to as "the July 2009 Meetings"). It is

uncertain who attended these meetings and exactly what was discussed. Nevertheless, my review

of the record allows me to conclude that the following occurred:

- Weir held the first meeting at his office and attended the later meeting by phone. (N.T. at 19, 61).

- The following individuals attended one or both of the July 2009 Meetings with

---

[9](...continued)

Weir was "in touch with Brown Printing." (N.T. at 14). Therefore, I infer that Weir merely counseled
DCI with respect to Brown Printing claim.

Weir:  Cutler, Gayl, Flitter, David Goodman and Noah Goodman.[10] (N.T. at 18, 32, 35, 63 & 65).

- The most notable topics discussed during the July 2009 Meetings were:

    - DCI's impending demise as a going concern;

    - DCI's options, including whether bankruptcy would be appropriate;

    - the impact bankruptcy might have on shareholders;

    - the prospect of forming a new company, referred to as "Newco", and "walking away" from certain DCI payables. (N.T. at 19, 34, 64).

- During the July 2009 Meetings, Weir learned that:

    - a marketing agreement between DCI and Northstar existed,

    - Northstar was essentially financing the day-to-day working capital needs of DCI,

    - Northstar was paying for product for DCI,

    - Northstar had been maintaining DCI's electronic books on their computer. (N.T. at 63-64).

- Weir suggested that Cutler get DCI's Board of Directors focused on the company's financial problems. (N.T. at 65).

- The fiduciary obligations of both the directors and Weir were discussed. (N.T. at 35, 65-66).

- Weir held himself out as representing only Cutler's interests. (N.T. at 65-66).

- Flitter and Gayl were surprised to learn that Weir thought he represented only Cutler, and not DCI.[11]  (N.T. at 25, 35, 46).

---

[10]    David Goodman and Noah Goodman are two principals of Northstar Pulp & Paper ("Northstar"), one of the defendants in the Smurfit-Stone Container Payable Interpleader.

[11]    Flitter raised the issue of a conflict with Weir at that time and Weir responded "well, that's going to come up later, I'm sure." (N.T. at 25).

At some point after the July 2009 Meetings Weir and certain individuals held another

conference call.  According to Gayl, the purpose of this follow-up phone call was to consider what

he characterized as Weir's "proposal." (N.T. at 46).  Gayl testified:

> Weir outlined in some detail the extent of DCI's liabilities, and
> he seemed to have a pretty good understanding of – generally,
> about the amount of each kind of liability.  He knew that DCI,
> from a balance sheet perspective, was insolvent, and he began to
> recite the extent of that insolvency.  He then proceeded to
> discuss various alternatives by which some new entity might
> carry on the business of DCI, and my conclusion from that
> discussion is he favored what, in essence, would have been a
> consensual replevin with Bryn Mawr Trust, followed by a new
> entity, which would carry on the business of DCI.  He was not
> proposing to treat the Creditors generally, and he proposed only
> a small interest for the Estate of David Cutler, which was a
> fraction of what was owed by DCI to the estate.  And also, we
> had absolutely no confidence of ever realizing on that interest
> because it was very clear to me that Northstar was to be the
> entity funding this new venture, and I had and have absolutely
> no confidence that the estate would have ever seen a single
> penny from any venture that Northstar was involved in.  And
> also, was deeply troubled by Mr. Weir's proposal that would
> have involved American Color Graphics getting nothing, Brown
> Printing getting nothing, while the vendors that the new entity
> would carry forward with would be paid.

(N.T. at 33-34).  The record does not reflect whether DCI's principals took any action consistent

with or otherwise as a result of the July 2009 Meetings.

Meanwhile, on or about July 15, 2009, ACG made a demand for arbitration of its claim

against DCI.  Weir then advised ACG's counsel that he was not representing DCI in the

arbitration proceeding.  (N.T. at 72; Ex. DCI-2, time entry dated July 15, 2009).

On August 12, 2009, Cutler resigned from his office as President of DCI.  (N.T. at 29).

On August 17, 2009, a paralegal with Weir & Partners filed with the Department of State

of Pennsylvania a Certificate of Organization for Independence Pulp & Paper Company, LLC

11

("Independence Pulp").[12]  (See Ex DCI-4).  Independence Pulp competed with DCI during the few

weeks thereafter that DCI continued to operate. (N.T. at 30-31).  Gayl understood Independence

Pulp to be Cutler's company.  (N.T at 30).

On August 19, 2009, Weir sent a letter (by e-mail) to Gibbon, the lawyer for the David

Cutler estate.  (See Ex. R-2).  In his letter, Weir referenced a letter he received from Gibbon

earlier that day, which is not in the record.  Apparently, in the letter, Gibbon stated that Weir had

previously represented DCI.  In his response, Weir denied Gibbon's assertion:

> I have never "purported" to represent Darryl Cutler.  I have always held
> myself out as representing Darryl Cutler.  You will no doubt recall our first
> ever telephone conversation in which I introduced myself to you as Darryl's
> lawyer and we talked about the then existing disputes between Darryl and the
> estate.
>
> In the next telephone conversation I had with you, Hannah Cutler and
> Jonathan Gayl, among others, I specifically held myself out throughout that
> conversation as representing Darryl Cutler.  I have an engagement letter with
> Darryl Cutler, individually, which makes clear that I represent him.  I have no
> engagement, written or otherwise, with David Cutler Industries, Inc. ("DCI").  I
> have never met with the members of the Board of Directors of DCI, nor have I
> received any confidential information from the Board of Directors or from
> anyone else at DCI.

(Ex R-2).

Thereafter, on August 26, 2009, Gibbon, on behalf of DCI's Board of Directors, requested

---

[12]     For example, it actively solicited and, in some cases gained the former
vendors/customers of DCI. (N.T. at 30; Ex DCI-8).  It was acting in concert with Northstar Pulp, with
whom DCI had a marketing agreement (N.T. at 30).  Ultimately, DCI filed a lawsuit against
Independence Pulp, Northstar Pulp and Cutler, for both injunctive relief and damages in the Court of
Common Pleas, Philadelphia County.  (N.T. at 32).

that Weir return all DCI files in his possession.  Weir responded to Gibbon by letter the following

day, August 27, 2009, stating again that he never represented DCI, that he had no DCI files in his

possession and that the only documents he ever had were related to the demand for arbitration and

previously returned them.  (See Ex. DCI-5).

On September 25, 2009, DCI ceased operations.


# IV.  DISCUSSION

## A. Legal Standards for the Disqualification of Counsel – Generally

### 1.

> One of the inherent powers of any federal court is the admission and
> supervision of the conduct of attorneys practicing before it.  Courts have vital
> interests in protecting the integrity of their judgments, maintaining public
> confidence in the integrity of the bar, eliminating conflicts of interest, and
> protecting confidential communications between attorneys and their clients. To
> protect these vital interests, courts have the power to disqualify an attorney from
> representing a particular client.

Commonwealth Ins. Co. v. Graphix Hot Line, Inc., 808 F. Supp. 1200, 1203 (E.D. Pa. 1992)

(citing In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984)).

Federal courts look to state disciplinary rules and the American Bar Association's Code of

Professional Responsibility and Model Rules of Professional Conduct for guidance on

disqualification issues.  In the Eastern District of Pennsylvania, the U.S. District Court has

adopted the Rules of Professional Conduct promulgated by the Supreme Court of Pennsylvania as

the standards for professional conduct of lawyers admitted to practice in this district.  U.S. District

13

Court Local Rule 83.6 (Rule IV).

When a federal court refers to disciplinary rules to determine whether to disqualify a lawyer, those rules merely provide general guidance.  Violation of a disciplinary rule does not mandate disqualification.  Leslie Dick Worldwide, Ltd. v. Soros, 2009 WL 2190207, at *5 (S.D.N.Y. July 22, 2009) (citing Hempstead Video, Inc. v. Inc. Vill. of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005)).  If a court determines that a rule of professional conduct has been violated, disqualification is but one remedial measure a court may employ to uphold the ethical norms of the profession.  A court

> should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions.

United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980).

Therefore, in considering the matter before me, if I determine that a rule of professional conduct has been violated, I must then balance the delicate interests at stake before deciding whether to disqualify counsel. See Corn Derivatives Antitrust Litig., 748 F.2d at 162 (the Court of Appeals "has often employed a balancing test in determining the appropriateness of the disqualification of an attorney").  A party's choice of counsel is entitled to "substantial deference" and the court "should not quickly deprive [parties] of their freedom to choose the advocate who will represent their claims," particularly due to the risk that motions to disqualify may be motivated by an attempt to achieve a tactical advantage in the litigation.  Hamilton v. Merrill

14

Lynch, 645 F. Supp. 60, 61 (E.D. Pa. 1986); accord Caracciolo v. Ballard, 687 F. Supp. 159 (E.D. Pa. 1988). For these reasons, disqualification is viewed as a harsh remedy and generally is disfavored. Graphix Hot Line, Inc., 808 F. Supp. at 1203; Hamilton, 645 F. Supp. at 61. At the same time, however, a party does not have an absolute right to retain particular counsel, e.g., Kramer v. Scientific Control Corp., 534 F.2d 1085, 1093 (3d Cir. 1976), and in each case, the court must consider whether "the social need for ethical practice outweighs the party's right to counsel of his own choice." Lamson & Sessions Co. v. Mundinger, 2009 WL 1183217, at *3 (N.D. Ohio May 1, 2009).

The party seeking the disqualification of counsel bears the burden of proof on a motion to disqualify and must demonstrate that "continuing representation would be impermissible." Shade v. Great Lakes Dredge & Dock Co., 72 F. Supp. 2d 518, 520 (E.D. Pa. 1999). This principle has been restated in numerous reported decisions. E.g., In re BellSouth Corp., 334 F.3d 941, 961 (11th Cir. 2003) (citing cases); Leslie Dick Worldwide, Ltd., 2009 WL 2190207, at *6 (citing cases); Henry v. Delaware River Joint Toll Bridge Com'n, 2001 WL 1003224, at *1 (E.D. Pa. Aug. 24, 2001); In re Rite Aid Corp. Sec. Litig., 139 F. Supp. 2d 649, 656 (E.D. Pa. 2001); Brennan v. Independence Blue Cross, 949 F. Supp. 305, 307 (E.D. Pa. 1996); Cohen v. Oasin, 844 F. Supp. 1065, 1067 (E.D. Pa.,1994); Commercial Credit Bus. Loans, Inc. v. Martin, 590 F. Supp. 328, 335-36 (E.D. Pa. 1984). .

**2.**

I digress here, briefly, to make a few additional observations regarding the burden of proof.

In stating that DCI bears the burden of proof on the Motion to Disqualify, I am aware that some courts have stated that any doubts regarding the propriety of the representation should be resolved in favor of disqualification. E.g., Scher v. Slater Ent., LLC, 2006 WL 1799039, at *6 (D.N.J. June 28, 2006); see also Int'l Bus. Machs. Corp. v. Levin, 579 F.2d 271, 283 (3d Cir. 1978) (citing cases for that proposition); In re Rite Aid Corp. Securities Litigation,139 F. Supp. 2d 649, 656 (E.D. Pa. 2001). Taken to its logical conclusion, this statement might suggest that the burden of proof rests with the lawyer who is responding to a motion to disqualify based on an alleged violation of Rule 1.9(a). However, I am unaware of any reported opinion that integrates this proposition regarding how "doubts" should be resolved into a burden of proof analysis or that unambiguously places the burden of proof on the lawyer responding to a motion to disqualify under Rule 1.9(a).

Perhaps the statement that doubts are resolved in favor of disqualification can best be harmonized with the generally accepted view that the burden of proof resides with the moving party by interpreting the statement as a general, cautionary reminder relating to the balancing process that occurs after a court determines that a rule of professional conduct has been violated.

16

That is, once a violation of a rule of professional conduct has been proven and the balancing of

competing interests is necessary, the court should give appropriate weight to the need to maintain

public confidence in our legal system.  When a court finds a violation of Rule 1.9(a) (and likely

Rule 1.7(a) as well), the public interest that may render disqualification appropriate may be at its

zenith.  Both Rule 1.7(a) and 1.9(a) are designed to eliminate conflicts of interest, enforce a

lawyer's duty of loyalty to his client and protect confidential communications.[13]  Each of these

interests embody core values that are deeply engrained in our adversary system of justice.  Indeed,

it is difficult to envision many cases in which a court would find a violation of Rule 1.7(a) or

1.9(a), yet also conclude that disqualification is not appropriate.[14]

    In light of the practical effect a finding of a violation of Rule 1.9(a) has in the balancing of

interests in an attorney disqualification motion, I am unpersuaded by the suggestion of some

courts that a "shifting of burdens" approach be employed.  Under such an approach, the burden of

proof is placed on the responding lawyer on the issue whether the later representation is consistent

---

[13]    See Pa. RPC 1.7, Explanatory Comment (General Principles) ("Loyalty and independent
judgment are essential in the lawyer's relationship to a client); Pa. R.C.P. 1.9, Explanatory Comment
(lawyers have "certain continuing duties with respect to confidentiality and conflicts of interest" after
termination of a client-lawyer relationship).

[14]    Perhaps the same cannot be said as to the violation of other rules of professional
conduct.

with Rule 1.9(a), while the ultimate burden of proof on the issue of the disqualification remains

on the movant.[15]  In my view, this purported shifting burden analysis is illusory, at least under

Rules 1.7(a) and 1.9(a).  Effectively, it places the burden of proof on the respondent and I believe

there are sound policy reasons (expressed by the courts that regard disqualification as a harsh,

disfavored remedy) why the burden of proof in a disqualification motion has traditionally been

placed on the movant.    I see no reason to depart from that well-established principle.


**B.  Legal Standards Under Pa. RPC 1.9(a)**

1.

Pa. RPC 1.9 provides in relevant part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter
> represent another person in the same or a substantially related matter in which that
> person's interests are materially adverse to the interests of the former client unless
> the former client gives informed consent.

. . .

---

[15]    See Holcombe v. Quest Diagnostics, Inc., 2009 WL 4673858, at *3 (E.D. Pa. Dec. 8,
2009); see also INA Underwriters Ins. Co. V. Nalibotsky, 594 F. Supp. 1199, 1205-06 (E.D. Pa. 1984)
("only where it is clearly discernible, 'that the issues involved in a current case do not relate to matters in
which the attorney . . . represent(s) the (sister corporation) will the attorney's present representation be
treated as measuring up to the standard of legal ethics.'") (quoting Westinghouse Elec. Corp. v. Gulf Oil
Corp., 588 F.2d 221, 224 (7th Cir. 1978).  But see Foley v. Int'l Bhd.. of Elec. Workers Local Union 98
Pension Fund, 1998 WL 720153, at *4 (E.D. Pa. Sept. 10, 1998) (in disqualification motion, burden of
establishing a "substantial relationship" between the prior and current representation is on the moving
party).

18

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

An lawyer violates Rule 1.9(a) if

> (1) counsel formerly represented a party;

> (2) the former representation is the same or substantially related to the present matter;

> (3) the interests of counsel's current client are materially adverse to the interests of the former client; and

> (4) the former client has not consented.

See, e.g., Jordan v. Philadelphia Hous. Auth., 337 F. Supp.2d 666, 672 (E.D. Pa. 2004).

In this case, there is no dispute that DCI has established the third and fourth elements for proving a violation of the rule.[16]  I must determine whether DCI is a former client of Weir.  If DCI

---

[16]     There is no situation more "materially adverse" than when a lawyer's former client is an adverse party in a lawsuit against that lawyer's current client. Jordan , 337 F. Supp.2d at 673. Therefore, the interests of DCI (Weir's former client) and Weir's present clients (all of whom either have been sued by DCI or are competing claimants to a fund that has been interpleaded) are materially adverse. Also, it is obvious that DCI has not consented to Weir's representation of his current clients and Weir does not claim otherwise.

19

is a former client, I must then decide if the subject matter of Weir's prior representation of DCI

was "substantially related" to the subject matter in the adversary proceedings and main bankruptcy

case.

**2.**

The "substantially related" inquiry merits some additional attention.

The Explanatory Note to Pa. R.P.C. 1.9 states:

> The scope of a "matter" for purposes of this rule depends upon the facts of a
> particular situation or transaction. The lawyer's involvement in a matter can
> also be a question of degree.

The determination whether "matters" are "substantially related" under Pa. RPC 1.9(a)

requires a critical factual analysis and consideration of the following three (3) questions:

> (1) What is the nature and scope of the prior representation at issue?
>
> (2) What is the nature of the present lawsuit against the former client?
>
> (3) In the course of the prior representation, might the client have disclosed to his
> attorney confidences which could be relevant to the present action and could
> any such confidences be detrimental to the former client in the current
> litigation?

Graphix Hot Line, 808 F. Supp. at 1204; accord Nalibotsky, 594 F. Supp. at 1206; see also Jordan,

337 F. Supp.2d at 673.[17]

The third question in the inquiry probably has generated the most judicial discussion and

gloss.  Courts have cautioned that:

> The mere disclosure of confidential information to counsel in the course of the
> prior representation is not, itself, sufficient grounds for disqualification of that
> counsel when he later represents an adverse party.  The confidential information
> must be of the type which one would expect to be related to the issues in the
> present litigation.

Nalibotsky, 594 F. Supp. at 1207.

Further,

> the court should not allow its imagination to run free with a view to hypothesizing
> conceivable but unlikely situations in which confidential information "might" have
> been disclosed which would be relevant to the present suit.  "The lawyer 'might
> have acquired' the [substantially related] information in issue if (a) the lawyer and
> the client ought to have talked about particular facts during the course of the
> representation, or (b) the information is of such a character that it would not have
> been unusual for it to have been discussed between lawyer and client during their
> relationship."

Id. at 1206 (quoting Realco Servs., Inc., v. Holt, 479 F. Supp. 867, 871-72 (E.D. Pa. 1979));

accord Pa. RPC 1.9, Explanatory Comment ("A conclusion about the possession of [confidential,

---

[17]     In Jordan, the court engaged in a two-step approach to evaluate the "substantial
relationship test."  First, it examined what confidential information "might have been gained" in the
prior representation.  Second, it decided whether the attorney confidences could be "relevant or possibly
detrimental" to the former client in the present case.

21

disqualifying] information may be based on the nature of the services the lawyer provided the

former client and information that would in ordinary practice be learned by a lawyer providing

such services").


### C. Weir Was Retained Initially by Cutler, Not DCI

The first issue that I must resolve is whether Weir represented DCI. DCI contends that

Weir was DCI's lawyer from the outset of his representation. In making this contention, DCI

relies primarily on the fact that DCI issued the check for Weir's initial retainer. I disagree and

find that Cutler was Weir's initial client.

Generally speaking, payment of an attorney's initial retainer does not create an attorney-

client relationship between the payor and the lawyer. It is well established that a client's initial

retainer with an lawyer may be paid by a third party in appropriate circumstances. <u>See generally</u>

Pa. R.P.C. 1.8(f); Pa. R.P.C. 1.8, Explanatory Note (Person Paying for Lawyer's Services)

(recognizing that lawyers are "frequently asked to represent a client under circumstances in which

a third person will compensate the lawyer" and stating rule that the lawyer accepting third party

payment must ensure that it will not interfere with the lawyer's independent, professional

judgment or the lawyer-client relationship). Therefore, the fact that DCI issued the check for the

retainer and did not account for the payment as a personal expense of Cutler is relevant, but hardly

22

controlling, in this inquiry.

In the circumstances presented here, Weir's testimony that Cutler was his initial client was credible and supported by the terms of the letter he sent to Cutler confirming the retention. (Ex. R-1). The retainer letter was addressed to Cutler personally and described the representation as relating to "your interests." (Id.). This evidence demonstrates convincingly that Cutler was Weir's initial client and is far more persuasive that DCI's evidence relating to the source of payment for Weir's initial retainer.

**D.     An Implied Attorney-Client Relationship Existed Between DCI and Weir**

The next issue presented is whether there came a time when Weir "formerly represented" DCI "in a matter" within the meaning of Pa. RPC 1.9(a).

There is no dispute that there was no formal, written memorialization of an attorney-client relationship between DCI and Weir.  However, "[w]here no express relationship exists, the intent to create an attorney-client relationship can be implied from the conduct of the parties."  Clark Capital Mgmt. Group, Inc. v. Annuity Investors Life Ins. Co., 149 F. Supp.2d 193, 196 (E.D. Pa. 2001) (citations omitted); accord Comm. on Prof'l Ethics & Grievances of the Virgin Islands Bar Assoc. v. Johnson, 447 F.2d 169, 174 (3d Cir. 1971) ("An attorney-client relationship is one of agency and arises only when the parties have given their consent, either express or implied, to its

formation").  Under Pennsylvania law, an implied attorney-client relationship is shown if

> (1) the purported client sought advice or assistance from the attorney;
>
> (2) the assistance sought was within the attorney's professional competence;
>
> (3) the attorney expressly or impliedly agreed to provide such assistance; and
>
> (4) it is reasonable for the putative client to believe that the attorney was representing him.

Capitol Surgical Supplies, Inc. v. Casale, 86 Fed. Appx. 506, 508 (3d Cir. 2004) (not precedential) (citing Atkinson v. Haug, 622 A.2d 983, 986 (Pa. Super. Ct. 1993)).

In this case, after Cutler retained Weir, discussions between them regarding the financial well-being of DCI were inevitable because Cutler's financial situation was intertwined with DCI's financial health  − if, for no other reason that Cutler had personally guaranteed DCI's $2.8 - 3.0 million loan with Bryn Mawr Trust.  In these circumstances, it strikes me as perfectly natural that Cutler, as the President of DCI, would confide in his newly-retained personal counsel about any pressing financial problems DCI was experiencing and, through those discussions, educate Weir regarding DCI's overall financial status.

From the evidence, I infer that there later came a time, probably in April 2009, when: (a) the collection pressure from two trade creditors (ACG and Brown Printing) intensified to the point where Cutler feared that collection action might disrupt DCI operations, (b) as a result of this concern, he discussed DCI's accounts payable problems with Weir and (c) requested Weir's

assistance on behalf of DCI. This led to a blurring of the boundaries of Weir's representation and a period of time in which Weir represented both Cutler and DCI.

While Cutler's ultimate motivation for enlisting Weir's assistance in attempting to placate DCI trade creditors may have been to further his own interests, given his position as President and CEO of DCI, it is impossible to treat his request that Weir intervene as anything other than one by an authorized representative of DCI that Weir represent DCI.[18]

I find, therefore, that, even without a formal retainer agreement, all of the elements under Pennsylvania law for an implied attorney-client relationship between DCI and Weir were satisfied. This relationship began as early as some time in April 2009 and certainly no later than May 4, 2009, when Weir sent the e-mail to ACG's lawyer holding himself out as DCI's counsel.

### E. The Scope of the Weir-DCI Attorney-Client Relationship

Having found that DCI and Weir formed attorney-client relationship, I next consider the scope of that relationship. In analyzing this question under Rule 1.9(a), a court

> should consider both the purposes for which the attorney was employed and the facts underlying the matter for which the attorney was responsible. However, the focus should be upon the reasons for the retention of counsel and the tasks which the

---

[18]    There is no detail in the record regarding the precise scope of Cutler's duties and authority as President and CEO of DCI. However, it would be surprising if DCI's corporate governance documents would restrict the President and CEO from hiring a lawyer to represent the company.

> attorney was employed to perform. Once the purposes for which the attorney was employed are clear, it is then possible to consider the type of information which a client would impart to an attorney performing such services for him.

Nalibotsky, 594 F. Supp at 1206; see also Reading Anthracite Co. v. Lehigh Coal & Navigation Co., Inc., 771 F. Supp. 113, 115 (E.D. Pa. 1991) (stating that the first prong of the test requires an examination of the factual context of the prior representation).

Here, I conclude that the attorney-client relationship between Weir and DCI was limited in scope and duration.

The record suggests that the purpose of Weir's representation was to assist DCI in negotiating a resolution of two (2) trade payable claims (ACG and Brown Printing). This representation lasted approximately two (2) months, or until the Demand for Arbitration from ACG was received in July 2009. After conducting what appears to be a modest, general investigation of DCI's financial situation, Weir's primary activity consisted of engaging in a few phone calls and exchanging several e-mails with ACG's counsel. From the record before me, it does not appear that he communicated with any Brown Printing representative in connection with the Brown Printing receivable. He did not enter his (or his firm's) appearance on DCI's behalf in any formal proceeding in connection with either trade creditor.

DCI alleges that Weir's representation was much broader than what is described above. In particular, the Debtor points out that Weir initiated the July 2009 meetings in which various DCI-

related individuals discussed DCI's future existence and options in addressing its financial

distress.[19] DCI suggests that Weir was integral to the July 2009 Meetings. Notably, both Flitter

and Gayl testified that they were surprised to learn at the July 2009 meetings that Weir believed

he represented only Cutler and not DCI.

Despite Weir's attendance at and involvement in these meetings, I am not persuaded that

Weir's attorney-client relationship expanded from a circumscribed representation of DCI with

respect to the two (2) "threatening" trade creditors into a comprehensive representation of DCI in

connection with its overall financial distress; I am not convinced that DCI retained Weir as its

workout lawyer.

At the July 2009 meetings, Weir made it clear that he was representing only Cutler's

interests and both Gayl and Flitter acknowledged this. While some of the participants at the

meetings may have been confused by or misunderstood Weir's role temporarily,[20] the record does

not support a finding that Weir's representation of DCI went beyond the confines of his authority

---

[19]    DCI also suggests that in connection with his representation Weir was privy to sensitive company financial data after April 2009. However, DCI's witnesses could not identify with particularity any such documents.

[20]    That there was some confusion during this likely hectic time is not surprising considering: (a) the overlap between the interests of Cutler and DCI, (b) the fact that Weir had been given access to information regarding the ACG and Brown Printing trade claims and (c) the fact that Weir had negotiated on DCI's behalf with ACG.

27

to resolve the two (2) (albeit very large) trade claims. I find credible Weir's testimony that the role he played in communicating with DCI's principals and other personnel in the July 2009 meetings was primarily to make sure that the persons in control of DCI (other than Cutler) were aware of DCI's difficult situation and Cutler's perception that it was imperative for the company to develop an action plan – all of this being necessary so that Weir's client, Cutler, could determine what action he might take to protect his own interests. In his communication with the other DCI players, Weir surely quantified, to some degree, DCI's financial situation and outlined possible future scenarios. However, notwithstanding the brief period of confusion experienced by certain participants in the meetings, I am satisfied that Weir's communications were made in his capacity as Cutler's representative and not as DCI's lawyer.

In short, in evaluating whether Weir may represent his current clients consistent with Pa. RPC 1.9(a), I find that there was a prior representation of DCI, but that the scope of "the matter" in the prior representation was relatively narrow. DCI retained Weir to resolve, or at least buy DCI more time to resolve, its problems with two (2) trade creditors.

### F. Weir's Current Representation

Weir & Partners has entered its appearance in four (4) adversary proceedings.

The first adversary proceeding is State Road Turnover Action, Adv. No. 09-0373. In its

complaint, DCI requests a declaratory judgment, turnover and related relief with respect to certain property it alleges constitutes property of its bankruptcy estate. DCI alleges that Weir's clients[21] fraudulently conveyed DCI's property to themselves, including specific equipment used in DCI's waste paper recycling business, that they converted the property and possess certain confidential business and accounting records of DCI. Weir's clients deny they possess any DCI property.

The second adversary proceeding, the Smurfit-Stone Container Payable Interpleader, Adv. No. 10-028, is in the nature of an interpleader. The Plaintiff alleges it has received invoices from both DCI and Northstar and seeks to avoid duplicate liability. The plaintiff's business relationship with DCI and Northstar arises from a joint venture between DCI and Northstar, both of which are defendants in the proceeding. Weir has entered his appearance on behalf of Northstar, but no answer has been filed.

In the third adversary proceeding, the Converting Solutions Adversary, Adv. No. 10-042, DCI alleges that in January 2008, Cutler caused DCI to enter into an equipment lease for equipment that was used in Converting Solutions' business operations. DCI also alleges that Cutler caused DCI to make cash advances to Converting Solutions totaling almost $700,000.00

---

[21]    In addition to Cutler, Weir represents three (3) other defendants in this adversary proceeding: Jason Garon, Jeffrey Pitkow and Independence Pulp. Garon and Pitkow are former DCI employees. Independence Pulp is the entity Weir & Partners helped Cutler form on August 17, 2009, days after his separation from DCI.

between August 2007 and June 2009 and that those transfers are avoidable, fraudulent transfers.
Weir & Partners represents Cutler, who has filed an answer denying the material allegations in
DCI's complaint.

Finally, in the fourth adversary proceeding, the Sovereign Bank Adversary, Adv. No. 10-
00054, DCI seeks to avoid certain prepetition transfers to Sovereign Bank.  DCI alleges that
Sovereign received an unauthorized grant of a mortgage on DCI's property and a related
assignment of rents as security for certain loans the bank made to Cutler in 2007 and 2008.
Again, Weir & Partners represents Cutler, who has filed an answer denying the material
allegations in DCI's complaint.

### G. Whether Confidences Might Have Been Disclosed in the Course of the Prior Representation That Could Be Prejudicial to DCI in the Bankruptcy Litigation

DCI alleges that Weir ought to have discussed with Cutler a wide-range of confidential
information relevant to DCI's financial condition -- such as how the Debtor became insolvent,
how much money was paid to DCI's officers, vendors and employees and whether there was
consideration.  (DCI's Supp. Br. at 6-7).  DCI suggests the discussions would have included the
location of DCI's records and assets, how such assets were owned, possible strategies to
maximize the value of DCI's assets, including causes of action DCI might have against third
parties.  (Id.).  As to the Smurfit-Stone Container Payable Interpleader, in particular, the Debtor

30

suggests that Weir may have been privy to discussions over who owns the accounts payable and how shipments were handled with Northstar.

For several, related reasons set forth below, I disagree.

First, the nature and scope of Weir's prior representation of DCI was narrow. His representation of DCI focused on the looming threat to DCI posed by two (2) trade creditors. He was not retained to develop a comprehensive debt reorganization strategy. He was retained to resolve two (2) specific accounts payable claims – or at least keep the creditors at bay for the time being. In those circumstances, the type of information that Weir "ought" to have discussed with DCI or that it would have been "usual" for him to have discussed[22] strikes me as less far-reaching than DCI now imagines. Given the limited nature of this representation, I do not consider it likely that Weir would have found it necessary to put DCI under the type of financial microscope that would have given him access to sensitive business information that would prejudice DCI in the later adversary proceedings. Nor is there any suggestion in the record that Weir represented DCI in connection with the transactions that DCI now seeks to set aside (e.g., the DCI-Northstar joint venture, the DCI-Converting Solutions transactions) through the adversary proceedings.

Certainly, during the roughly two (2) months of dual representation, to stake out DCI's

---

[22]    See Nalibotsky, 594 F. Supp. at 1207.

negotiating position with the two (2) trade creditors, it would have been natural for Weir to obtain

specific information regarding the two (2) accounts payable as well as garner some information

regarding DCI's general financial position from a balance sheet and projected income/expense

perspective.   However, I fail to see how this general information provides Weir with any

advantage in litigation that challenges the <u>bona fides</u> of other transactions and business

relationships that DCI entered.[23]  As a result, for purposes of Pa. RPC 1.9(a), I perceive no

substantial overlap between the subject matter of Weir's prior representation and the subject

matter of the four (4) adversary proceedings.[24]

Second, insofar as Weir obtained some non-public information about DCI in the course of

his representation, I consider it doubtful that any of the information continues to be "confidential"

as contemplated by Rule 1.9(a).  In reaching this conclusion, I find guidance in the rule's

---

[23]     This is especially true regarding the Sovereign Bank Adversary.  I perceive no reason
why Weir's representation of DCI with respect to the two (2) trade creditors for two (2) months in mid-
2009 would have resulted in his receipt of confidential information relating to this particular claim
arising from events that occurred in 2007 and 2008.

[24]     As for Weir's entry of appearance in the main bankruptcy case, DCI has recognized
Cutler's status as a co-debtor by listing him in Schedule H and there are presently no contested matters
that differentiate Cutler's interests from those of creditors generally.  Thus, at this point, Weir's entry
does little more than provide him with notice of the docket activity in the case.  Until there is some
concrete dispute between DCI and Cutler arising in the administration of the main case, it is difficult to
conceptualize how DCI is prejudiced by Weir's representation of Cutler.

Explanatory Note:

> Information that has been disclosed to the public or to other parties adverse to the
> former client ordinarily will not be disqualifying. Information acquired in a prior
> representation may have been rendered obsolete by the passage of time, a
> circumstance that may be relevant in determining whether two representations are
> substantially related. <u>In the case of an organizational client, general knowledge of
> the client's policies and practices will not preclude a subsequent representation; on
> the other hand, knowledge of specific facts gained in a prior representation that are
> relevant to the matter in question ordinarily will preclude such representation.</u>

Pa. RPC 1.9, Explanatory Comment (emphasis added).

Here, I consider it unlikely that in his representation of DCI, Weir obtained any

information about DCI that would not have been disclosed in its bankruptcy schedules and

statement of financial affairs or that otherwise would be readily obtainable by interested parties in

the course of the administration of a bankruptcy case.

Third, DCI has not identified any type of arguably sensitive DCI information that Weir

likely received from any source other than his own client, Cutler. The only evidence in the record

that purports to describe the information that DCI personnel (other than Cutler)[25] supplied Weir is

Flitter's limited and vague testimony that he supplied "financials" to Weir. (N.T. at 15).[26] His

---

[25]    Indeed, other than Cutler, Flitter (and Jeffrey Pitkow, who provided Weir with
information regarding the ACG payable at Flitter's direction, (N.T. at 15-16)), on this record, I do not
know whether any other DCI personnel provided Weir with information about the company.

[26]    Most of Flitter's testimony related to the July 2009 meetings, which were not meetings in
(continued...)

33

only specific reference on the subject was that Weir requested a "break-down" of the ACG debt

(N.T. at 16) – hardly the kind of information that would prejudice DCI's position in any of the

pending adversary proceedings.

Fourth, to the extent that Cutler provided Weir with DCI business and financial

information (other than the ACG debt breakdown), he probably did so, not to advance Weir's

circumscribed representation of DCI with respect to the two (2) trade creditors, but rather, to assist

Weir in understanding Cutler's exposure and in support of Weir's representation of Cutler

personally.  This suggests that DCI's present discomfort with Weir's participation as counsel in

the adversary proceedings stems less from Weir's prior representation of DCI and more from the

facts that: (a) after Weir's limited representation of DCI terminated, the interests of DCI and

Cutler became, and are now, intensely adverse and (b) DCI believes that Weir may have assisted

Cutler in conduct that DCI contends harmed the company.  In other words, and most on point

under Rule 1.9(a), it appears likely that in the current adversary proceedings between DCI and

Cutler, Weir has no sensitive, DCI information as a result of his prior, limited representation of

DCI; he likely has no more information than any other lawyer now representing Cutler would

have.

---

[26](...continued)
which DCI supplied information to Weir, but rather, were meetings in which Weir described DCI's status
as he understood it and exhorted the principals of the company to take action.

34

For these reasons, I conclude that the record does not support a finding under Pa. RPC

1.9(a) that in the course of Weir's limited representation, DCI might have disclosed confidences

to Weir that would be relevant and prejudicial to DCI in the pending adversary proceedings.  DCI

has failed to satisfy its burden of proving that the information it likely disclosed to Weir during

the course of the prior representation is substantially related to the present litigation within the

meaning of Pa. RPC 1.9(a). Therefore, Weir's appearance in this bankruptcy case and

representation of the various adversary defendants does not violate Rule 1.9(a).  There being no

violation of an applicable rule, there is no basis to disqualify Weir and Weir & Partners as

counsel.


## H. Weir Will Not Be Disqualified Solely on the Basis of An Asserted "Appearance of Impropriety"

Finally, DCI argues that even if Weir did not violate RPC 1.9, he should be disqualified

due to the "appearance of impropriety" created by his representation of the adversary proceeding

defendants against his former client.

I acknowledge that in some decades-old court decisions, courts state that a lawyer may be

disqualified to avoid even the appearance of impropriety.  See, e.g., Int'l Bus. Mach. Corp., 579

F.2d at 283.  However, DCI has not cited a single case in which a court has actually disqualified

an attorney absent a finding that the attorney violated of an ethical rule.  For the reasons set forth

in <u>Griffin-El v. Beard</u>, 2009 WL 2929802, at *8-9  (E.D. Pa. Sept. 8, 2009), I consider it doubtful

that the court should exercise its inherent power to disqualify counsel in the absence of the

violation of an ethical rule.   However, my holding need not be so broad to resolve the present

Motion to Disqualify.  Assuming <u>arguendo</u> that circumstances may exist in which a court should

disqualify counsel due to an appearance of impropriety, even though no ethical rule has been

violated, I find that disqualification is not appropriate here.  As the court reasoned in <u>Griffin-El</u>:

> This Court strongly agrees that attorneys must always avoid the appearance of
> impropriety. However, in the absence of an ethical rule violation, prejudice to
> Defendants, or an appearance of impropriety which rises to a level that
> outweighs the countervailing interests in the case, disqualification is not
> appropriate.

<u>Id.</u> at *10.

# V. CONCLUSION

When a closely held entity is in financial distress and seeks legal representation, there is a

potential for the lines of representation to blur.  Perhaps the more common concern is that

principals of the entity may misunderstand counsel's proper role and fail to realize that counsel's

duty is to the entity and not to the principals of the entity.  The present matter is atypical in that

regard and presents the converse situation.  Here, the record establishes that Weir's initial role

was unambiguous:  he was Cutler's personal counsel.  Later in the representation, however, he

36

undertook to represent DCI in connection with a discreet and limited matter.

DCI's Motion to Disqualify arises largely because Weir undertook this dual representation without taking the precaution of setting out clearly and in writing for all parties involved the limited scope of his representation of DCI. To that extent, at a minimum, he can be faulted.[27]

Further, in the circumstances presented here, where Weir participated in the hurlyburly of DCI's crisis management sessions during DCI's descent from an insolvent going concern to a shuttered business (making it clear, at least eventually, that his role was to represent Cutler and not DCI), it is understandable that DCI's current principals now seek his disqualification. Apart from antagonism of DCI's current managers toward Cutler, which has been transferred to some degree to Weir, it surely seems counterintuitive to non-lawyers that, after the conclusion of the representation, a client's former attorney would represent the client's adversary in any subsequent lawsuit against the client. However, if the two matters lack sufficient identity and relatedness, that is precisely what the rules of the profession permit. Here, the current legal disputes lack the requisite identity and relatedness to Weir's prior representation of DCI to mandate that he step aside; his current representation of DCI's adversaries is permissible.

---

[27]    Perhaps also, Weir should have realized that Cutler and DCI were on a path that would lead them to adverse positions and, prudently, should have declined to represent DCI. However, without a better record and as apparent the eventual collision course between Cutler and DCI may seem today, I am unwilling to conclude that Weir should have predicted that it would occur. Twenty-twenty hindsight is acute.

On this record, I cannot conclude that Weir's present clients will gain any unfair advantage as a result of his prior representation of DCI or that Weir has violated any Pa. RPC 1.9(a).

Accordingly, I will deny the Motion to Disqualify.

An Order consistent with this Memorandum will be entered.

Date:    April 20, 2010

_____
ERIC L. FRANK
U.S. BANKRUPTCY JUDGE